UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No.   2:24-cv-05475 MWC (AGRx)                                         Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

---

Present: The Honorable:   Michelle Williams Court, United States District Judge

| T. Jackson | No Reporter |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

Attorneys Present for Plaintiffs: N/A        Attorneys Present for Defendants: N/A

**Proceedings: (IN CHAMBERS) ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 27)   JS-6**

   Before the Court is a motion for summary judgment filed by Defendant AmGUARD Insurance Company ("Defendant").  Dkt. # 27 ("*Mot.*").  Plaintiff Sandlor Properties, Inc. ("Plaintiff") opposed.  Dkt. # 29 ("*Opp.*").  Defendant replied.  Dkt. # 33 ("*Reply*").  The Court finds the matter appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  Having considered the moving and opposing papers, the Court **GRANTS** Defendant's motion for summary judgment.

I.   Background

   Plaintiff owns commercial real estate and is a landlord for various properties.  Dkt. # 33-2 ("*P's UF*"), ¶ 2.  Central to this case, Plaintiff owns a property in Huntington Park with the address 5501 Pacific Boulevard, Huntington Park, California, 90255 (the "Huntington Property").  *Id.* ¶¶ 1–2.  On April 9, 2022, Plaintiff tendered an insurance claim for an incident of burglary and vandalism that occurred at the Huntington Property, which included, among other things, the theft of dental chairs and electrical wiring (the "Incident").  *Id.* ¶ 24.

   A.   Insurance Policy

   Prior to the Incident, Defendant issued Plaintiff an insurance policy for property, including the Huntington Property ("SABP258741") (the "Policy").  *See* Dkt. 27-2, Ex. 1 ("*Policy*"), 19, 23 (noting effective dates of August 1, 2021, through August 1, 2022).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.   2:24-cv-05475 MWC (AGRx)                                             Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

The Policy labeled the Huntington Property's "Classification" as "Dentists (Lessors Risk Only)." *Id.*  The Policy generally covered burglary, vandalism, and theft, with certain carve-outs.  *P's UF* ¶ 1.  Notably, the Policy contained a vacancy exception, which stated:

> If the building where loss or damage occurs has been **vacant** for more than 60 consecutive days before that loss or damage occurs: (1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss: (a) Vandalism; (b) Sprinkler Leakage . . . (c) Building glass breakage; (d) Water damage; (e) Theft; or (f) Attempted theft.

*D's UF* ¶ 4 (emphasis added).  The Policy's "Description of Terms" defined "vacancy" as:

> **8.  Vacancy**
> **a. Description of Terms**
>
>> (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:
>>
>>> (a) When this policy is issued to a **tenant**, and with respect to that tenant's interest in Covered Policy, **building** means the unit or suite rented or leased to the tenant.  Such building is **vacant** when it does not contain enough business personal property to conduct customary operations.
>>>
>>> (b) When this policy is issued to the **owner or general lessee** of a building, **building** means the entire building.  Such building is **vacant** unless at least 31% of its total square footage is:
>>>
>>>> (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its **customary operations**; and/or
>>>> (ii) Used by the building owner to conduct **customary operations**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-05475 MWC (AGRx)                                  Date: December 30, 2024

Title      Sandlor Properties, Inc. v. AmGUARD Insurance Company

>   (2) Buildings under **construction or renovation** are not considered vacant.

*Id.* ¶ 3 (emphasis altered).  The Policy defined "Operations" as "your business activities occurring at the described premises."  *Id.* ¶ 5.  The policy did not define "customary."

   B.  Smile West's Dental Practice

At the time of the Incident, and during the months leading up to it, Plaintiff leased the entirety of the Huntington Property to a dental group, Dr. Barouir Deirmenjian DDS, Inc.  *P's UF* ¶ 3.  The dental practice is referred to as "Smiles West."  *See D's UF* ¶ 10.  Plaintiff leased the Huntington Property to Smiles West for $9,000 per month.  *P's UF* ¶ 3.

Smiles West used various areas of the building for storage of equipment, dental supplies, and orthodontic models.  *Id.* ¶ 4.  The first floor had eight to ten dental operatories (i.e., dental treatment stations).  Dkt. # 29-4 ("*Melkonian Decl.*"), Ex. A, 38:3–22.  The first floor also had a front desk, office space, a play area, video games, an area for storage of equipment, supplies, and patient charts.  *Id.*

Before the pandemic, as early as 2017, employees of other Smiles West locations (e.g., the Regional Manager) would go to the Huntington Property to complete tasks like "billing" or "making . . . schedules" because the Huntington Property "was not a full-time office."  *Id.* 46:19–47:10.  In 2017, the "intent" of the dental practice was to keep the Huntington Property as a "part-time office, and to slowly grow the business, and to use it for clerical work when [the] regional manager was in that area" and to "store items."  *Id.* 51:23–52:13.

The regional manager testified that when Smiles West first opened the Huntington Property location, it purchased the previous dental practice that was in that building, including the patient records of the previous dental practice.  Dkt. # 27-3, Ex. 42, 22:13–16.  Originally, the practice located at the Huntington Property treated only orthodontic patients.  *Id.* 23:21–24:7.  Sometime later, that practice began treating general dentistry patients as well.  *Id.*  The practice treated orthodontic and general dentistry patients on different days.  *Id.* 24:3–23.  The Smiles West Regional Manager testified that from approximately 2018 through 2020, the dental practice at the Huntington Property was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-05475 MWC (AGRx)                                            Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

seeing approximately fifteen patients per day for general dentistry days and fifty to sixty patients per day for the orthodontics days.  *Id.* 25:15–26:13, 28:1–9.  The dental practice treated about 120 to 140 patients per week at the Huntington Property.  *Id.* 28:25–29:8.

However, due to COVID-19, Smiles West started treating fewer patients at the Huntington Property.  *Id.* 29:9–25.  And beginning in November 2021, Smiles West moved the remaining patients it had been treating at the Huntington Property to other Smiles West locations.  *Id.* 63:9–64:15.  After November 2021, Smiles West no longer treated patients at the Huntington Property.  *Id.* 63:15–22.  Instead, the office was "in use for what it was intended for from the beginning, which was for storage of records, charts, supplies, equipment," as well as employees (like the Regional Manager) "doing different things" like interviewing people, billing, getting mail, and collecting supplies.  *Id.* 63:15–64:15.  The Huntington Property also stored appliances, like refrigerators.  *Melkonian Decl.*, Ex. B, 331:3–333:10.  Other Smile West locations would pick up appliances (like a refrigerator) if they needed anything.  *Id.* 331:3–333:10.  After November 2021, Smile West dentists were no longer showing up to the Huntington Property, only staff.  *Melkonian Decl.*, Ex. A, 64:4–15.

Numerous photos in the record capture the Huntington Property.  Dental advertisements covered the Huntington Property's street-facing walls, including signs exclaiming:  "Schedule Today!" "New Patients Welcome!" "Dental Braces," "Most Insurances & Medi-Cal Accepted!" "Free Orthodontic Consultation!" "Welcome to Our Practice," "Emergency Appointments and Walk-Ins Welcome." *Dlugosz Decl.*, Ex. 24, 408–10; *id.*, Ex. 25, 454, 469 (capitalization omitted).

From the period of December 20, 2021, to April 26, 2022, the Huntington Property's water bills indicate zero water usage.  *D's UF* ¶ 43; Dkt. # 27-2 ("*Dlugosz Decl.*"), Ex. 26, pp. 569–70.  Nonetheless, Smile West employees testified that the plumbing and bathroom were functional during that time and at least one employee used the bathroom from January 2022 through April 2022.  *D's UF* ¶ 43.  In June 2021, Dr. Deirmenjian put the Huntington Property and dental practice up for sale.  *Id.* ¶ 49.

II.   Construction Plans

Before Smiles West began leasing the Huntington Property, the prior dentist used the second floor of the property as a residence.  *Dlugosz Decl.*, Ex 36, 50:16–51:11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | |
|---|---|
| Case No.   2:24-cv-05475 MWC (AGRx) | Date: December 30, 2024 |
| Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company | |

However, due to regulations, the City disallowed the use of the second floor as a residence and instead required the second floor to be converted to office spaces.  *Id.*

In October 2020, Plaintiff retained a construction group to help with the project of bringing the second floor into compliance with the City's requirements.  *P's UF* ¶ 17.  Zaian Construction ("Zaian") started working on the project.  *Id.*; *Melkonian Decl.*, Ex. C, 17:19–18:2.  The project required Zaian to prepare plans and obtain permits from the City.  *P's UF* ¶ 18.  Throughout the project, Zaian also engaged day laborers for tasks like demolition, pipe sizing, and electrical conduit sizing.  *Id.* ¶ 21.  A structural engineering and architecture company (ARPA) was also retained to develop structural plans for the Huntington Property.  *Id.*  ¶ 19.  And Energylogics was retained for the project's mechanical, electrical, and plumbing work.  *Id.* ¶ 20.

Between September 12, 2019, and the Incident, the project did not have the necessary permits.  *D's UF* ¶ 38.  On September 12, 2019, the City of Huntington Park issued a violation notice, which stated:  "A STOP WORK NOTICE was issued to the business on 9/12/19, as no permits or approved plans were located or provide for the un-permitted tenant improvements that were observed on the second floor of the building during the inspection . . . . After the BUILDING DEPARTMENT approves the scope of work proposed, then building permits can be issued.  NO MORE WORK CAN CONTINUE UNTIL PERMITS ARE OBTAINED."  *Dlugosz Decl.*, Ex. 22 ("*Notice of Violation*").

Despite the violation notice, Plaintiff asserts that the City allowed certain work to continue, including (but not limited to) maintaining the building, working on "previous construction," and doing inspections on any work that was done.  *Melkonian Decl.*, Ex. C, 42:5–23; *D's UF* ¶ 38.  Thus, while the plans developed, Zaian went "in and out" of the Huntington Property "all the time" in order "to get whatever the city required."  *Melkonian Decl.*, Ex. C, 36:24–37:13.  From February 2022 until the Incident, Zaian would visit the building once or twice a week.  *Id.* 90:4–13.  For example, in February 2022, Zaian was "there pretty much at least twice a week" to take "constant measurements," open walls to check for things, "cleanups here and there," and "maintaining" the building.  *Id.* 41:15–42:23.

On April 9, 2024, Plaintiff filed this action against Defendant alleging breach of contract and breach of the implied covenant of good faith and fair dealing.  *Compl.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-05475 MWC (AGRx)                                                              Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

Defendant removed this action based on diversity jurisdiction. Dkt. # 1. On November 8, 2024, Defendant filed this motion for summary judgment. *Mot.*

III.   Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party will have the burden of proof at trial, the movant can prevail by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2).

IV.   Evidentiary Objections

The parties assert several evidentiary objections and responses along with their briefings. *See, e.g.*, Dkt. # 29-3. "When determining a motion for summary judgment, the court may only consider evidence admissible at trial, though the form may be different at the summary judgment stage." *Godinez v. Alta-Dena Certified Dairy, LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). To the extent the Court relies on objected-to evidence, it relies on only admissible evidence and, therefore, **OVERRULES** the objections. *See Godinez*, 2016 WL 6915509, at *3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:24-cv-05475 MWC (AGRx)                              Date: December 30, 2024

Title    Sandlor Properties, Inc. v. AmGUARD Insurance Company


V.    Discussion

This motion asks whether the Policy covers Plaintiff for loss due to the Incident that occurred at the Huntington Property.  Under California law, which the parties do not dispute applies here, "[i]nterpretation of an insurance policy is a question of law" and "the ordinary rules of contractual interpretation apply."  *Travelers Prop. Cas. Co. of Am. v. Superior Ct.*, 215 Cal App. 4th 561, 574 (2013).  Under ordinary rules of contract interpretation, "the mutual intention of the parties at the time the contract is formed governs interpretation."  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004).  The parties' mutual intention "is to be inferred, if possible, solely from the written provisions of the contract."  *Id.*  Moreover, "[l]anguage in an insurance policy is interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.* (internal quotation marks omitted).  Ambiguous terms in the insurance policy "are resolved in the insureds' favor, consistent with the insureds' reasonable expectations."  *Id.* at 471.

Defendant's motion for summary judgment focuses on two arguments:  (1) that the Huntington Property was vacant because Smiles West was not using it for "customary operations," and (2) that the Huntington Property was vacant because it was not "under construction."  *Mot.*  The Court will address both below.

A.    Customary Usage

Defendant advocates that at the time of the Incident, the Huntington Property was "vacant" because the property was not being used for its "customary operations."  *Mot.* 21:1–24:21.  In opposition, Plaintiff argues the Huntington Property was being used for its customary operations because Smiles West always intended "normal business activity" at that location to include "administrative work" and the "storage of supplies, equipment, and other dental products."  *Opp.* 17:2–6.

As to the Policy itself, the Policy states that Defendant will not pay for loss from vandalism or theft if the property has been vacant for more than 60 consecutive days.  *D's UF* ¶ 4.  Under the Policy, a building is vacant "unless at least 31% of its total square footage is" used to conduct "customary operations."  *P's UF* ¶ 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-05475 MWC (AGRx)                               Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

California courts have interpreted similar vacancy clauses. California courts acknowledge that "[v]acancy provisions are 'premised upon the recognition that unoccupied properties face an increased risk of damage, whether from property-related crime such as theft or vandalism from building damage or loss related to neglect." *St Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs.*, 271 Cal. Rptr. 3d 773, 780 (Cal. Ct. App. 2020) (quotation omitted). "Many courts have found that provisions defining vacancy by whether a building was used to conduct 'customary operations' are unambiguous when interpreted in context . . . ." *See id.* at 784. Courts "have likewise found that the term 'customary operations' refers to the customary operations for which a property was insured or those of a lessee who operates at the property." *Id.* When a Policy has not internally defined "customary operations," courts have looked to the "ordinary meaning" of the words. *Id.* at 829–30. For instance, the word "customary" has been defined as, "commonly practiced, used, or observed." *Id.*

In *St. Mary*, the Pope of the Coptic Church requested that St. Mary purchase a house to be used as one of his residences. *Id.* at 778. After water damage at the purchased property, the insurer of the property denied a claim for the damage, relying on a vacancy provision in the insurance contract. *Id.* at 778–79. The California appellate court agreed with the insurer. *Id.* at 832–33. Except for a few appliances (like an HVAC system), and a "single chair," "the multiple-room residence was entirely unfurnished." *Id.* at 832. The court concluded that during the relevant period, "the residence . . . did not contain enough personal property to operate as a residence for the Coptic Pope" and thus fell under the vacancy provision. *Id.*

In analyzing the vacancy provision before it, *St. Mary* collected similar cases, including *Keren Habinyon Hachudosh D'Rabeinu Yoel v. Philadelphia Indemnity Ins.*, 462 Fed. Appx. 70 (2nd Cir. 2012), and *Saiz v. Charter Oak Fire Ins.*, 299 Fed. Appx. 836 (10th Cir. 2008). *See St. Mary*, 271 Cal. Rptr. at 830. In *Keren*, the Second Circuit considered an insurance policy that deemed a building "vacant," unless "31% of its total square footage [was] . . . [u]sed by the building owner to conduct customary operations." *Keren*, 462 Fed. Appx. at 72. The Second Circuit defined "customary" as "commonly practiced, used, or observed." *Id.* at 72–73 (citing Webster's Dictionary). The court determined that because the building was "insured as a 'High School,'" the "customary operations" of the building must refer to the "commonly practiced activity of operating a school." *Id.* at 73. The Second Circuit determined the building was "vacant" because the continuous training of students had been suspended and the property was instead being

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-05475 MWC (AGRx)                                      Date: December 30, 2024

Title       Sandlor Properties, Inc. v. AmGUARD Insurance Company

used "primarily" for "storage of school supplies, furniture, and computers." *Id.* at 72. The court also observed that "there had been no electricity or gas in the building" during the relevant period. *Id.* The court determined that a "one-day event" where "twenty-five teachers held a meeting . . . while students played on the roof" was "insufficient to defeat the application of the policy exclusion . . . because . . . the defining element of the operation of a school, the instruction of students, did not take place on that day." *Id.* at 73 (citing to the definition of "school" in Webster's Dictionary).

In *Saiz*, the owner of a restaurant began using his property as an office. *Saiz*, 299 Fed. Appx. at 838. Although he kept the property in "top condition" and may have at certain times "accessed and attended to the entire premises," he was no longer operating the premises as a restaurant. *Id.* at 840. The Tenth Circuit determined that to entail "customary operations," the property would need to conduct the "commonly practiced business activities of a family-style restaurant." *See id.* (pointing to the insurance policy, which described the property as "Restaurant PAC," with the business described as "Family Style"). The Court concluded the restaurant was "vacant" under the insurance policy. *Id.*

Here, there is no dispute that Smiles West is a dental practice. *D's UF* ¶¶ 10, 46, 49. The Policy itself notes "Dentist" under "Classification" of the Huntington Property. *Policy* 19, 23. And dental advertisements adorn the building, welcoming patients and promoting treatments. *See Dlugosz Decl.*, Ex. 24, p. 408–10; *id.*, Ex. 25, p. 454, 469. To avoid a "vacant" designation, Smiles West would need to be conducting its commonly practiced business activities during the relevant period—namely, operating a dental practice. On the contrary though, during the relevant period, Smiles West did not provide any treatment, from dental surgeries to routine examines. The practice did not see a single patient. *Melkonian Decl.*, Ex. A, 63:3–22. And dentists themselves never visited the facility. *Id.* at 64:4–15.

Plaintiff relies on the assertion that the Huntington Property was always intended to act as an administrative office and storage facility. *See Opp.* 9:18–14:4. However, Smiles West originally saw over 100 dental patients per week at this location. *See* Dkt. # 27-3, Ex. 42, 22:13–1628:25–29:8. And, even if by storing supplies and conducting administrative work, Smiles West was using the property as it intended, that does not necessarily mean Smiles West used the property for customary operations. After all, the school in *Keren* also stored supplies, furniture, and computers. 462 Fed. Appx. at 72.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:24-cv-05475 MWC (AGRx) | Date: December 30, 2024 |
| Title | Sandlor Properties, Inc. v. AmGUARD Insurance Company | |

Surely, the school was always meant to store such equipment; however, a school (like a dental practice) is not conducting customary operations when acting as a mere storage center. Moreover, like the restaurant in *Saiz*, the water bills for Smiles West show a "total usage" of zero during the months relevant to the vacancy clause. *Dlugosz Decl.*, Ex. 26. Although Smiles West employees claim the bathroom facilities functioned and were utilized to some extent, the water bills confirm that Smiles West was not operating as a dental practice, given that for months, the water was either not being used at all or was barely being used.

For these reasons, the Court finds that the Huntington Property was not being used for its customary operations.

      B.    <u>Construction</u>

Defendant also advocates that at the time of the Incident, the Huntington Property was not under construction or renovation because the City had issued a stop work order and Plaintiff was waiting on permits. *Mot.* 24:22–26:2. In response, Plaintiff cites case law to show that preparatory activities (in contemplation of future construction) can qualify as "construction." *Opp.* 18:3–19:27.

The California Supreme Court has analyzed an "under construction" exception to an insurance contract's vacancy provision. *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472 (Cal. 2006). As stated by the Supreme Court, the plain meaning of "under construction" can encompass more than just the "building of a new structure." *Id.* at 473. It could include "preparatory" activities for future construction or "substantial improvements or modifications to an existing structure" like "projects that transform a hovel into a mansion, raze and replace the entire interior of a structure, or otherwise *fundamentally transform* a building." *Id.* at 477–78 (emphasis added). The Supreme Court explained its rationale: "[i]f a building is regularly occupied during normal business hours, as is usually contemplated for commercial structures, then an insurer can assess risk . . . . When there is *substantial construction* activity on the premises, the risk of loss becomes roughly equivalent to that of an occupied building, thus giving the insurer the benefit of its prior risk assessment." *Id.* at 478 (emphasis added). With that in mind, the Supreme Court provided the following standard: "the property inquiry for determining whether a building is 'under construction' . . . is whether the building project, however characterized, results in '*substantial continuing activities*' by persons

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:24-cv-05475 MWC (AGRx)            Date: December 30, 2024

Title     Sandlor Properties, Inc. v. AmGUARD Insurance Company

associated with the project at the premises during the relevant time period." *Id.* (emphasis added). In contrast, "sporadic entry" is "insufficient to find a substantial continuing presence of workers required for a finding of 'construction.'" *Id.*

Here, Plaintiff's evidence only demonstrates sporadic entry, not substantial construction. Plaintiff has established that on certain days during the month—approximately, twice per week—Zaian workers visited the premises to take measurements, open walls (to aid with plans of future construction), take out studs, and clean. *P's UF* ¶¶ 23, 32, 34. Approximately two to four workers visited the site each week. *Id.* ¶ 35. Zaian held various site meetings to review plans. *Id.* ¶¶ 29–32. These meetings led to drywall being removed to confirm the building's safety (e.g., by checking the size of beams behind the drywall). *Id.* The Court finds that these site meetings and visits, scattered throughout the months leading up to the Incident, constitute sporadic activity. The evidence does not show "substantial" work or any work that might "otherwise fundamentally transform [the] building." *See TRB*, 145 P.3d at 477.

The City's no-work order supports this Court's conclusion. The City's order traps Plaintiff into a Catch-22. Although Plaintiff contends some work could continue, the City's order specifically declared: "NO MORE WORK CAN CONTINUE UNTIL PERMITS ARE OBTAINED." *See Notice of Violation* (capitalization in original). Either Plaintiff broke the City's order by conducting "substantial continuing activities" (which does not seem to be the case), or any work completed was limited in nature. *See TRB*, 145 P.3d at 477.

For these reasons, the Court concludes that the Huntington Property was not "under construction" during the relevant period and thus was "vacant" per the Policy.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:24-cv-05475 MWC (AGRx)                                    Date: December 30, 2024

Title   Sandlor Properties, Inc. v. AmGUARD Insurance Company

VI.   Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment.  This Order closes the case.[1]

**IT IS SO ORDERED.**

|  | : |
|---|---|
| **Initials of Preparer** | TJ |

---

[1] Because Defendant does not owe policy benefits under the Policy, both of Plaintiff's claims—breach of contract and breach of good faith (including punitive damages)—fail as a matter of law.